## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MILTON SHELTON**, | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-21-1082-D** |
| | ) | |
| **SCOTT NUNN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS</u>

The Attorney General of the State of Oklahoma, John M. O'Connor, appearing on behalf of the above-named Respondent, in response to the Petition for a Writ of Habeas Corpus on file herein shows the Court as follows:

1. Petitioner, Milton Shelton, an inmate in the custody of the Oklahoma Department of Corrections, appearing *pro se*, has filed with this Court a petition seeking federal habeas corpus relief.

2. Petitioner is currently incarcerated pursuant to a Judgment and Sentence entered in the District Court of Oklahoma County, Case No. CF-2016-6494, after Petitioner was found guilty of Human Trafficking for Commercial Sex, After Former Conviction of Two or More Felonies. Petitioner was sentenced to thirty (30) years imprisonment.

3. Petitioner filed a direct appeal of his conviction in the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"), Case No. F-2018-120. On May 23, 2019, the OCCA affirmed the Judgment and Sentence. Petitioner's direct appeal brief is attached as

Exhibit 1.  The State's direct appeal response brief is attached as Exhibit 2.  The OCCA's Summary Opinion is attached as Exhibit 3.

4.      On February 3, 2020, Petitioner filed an Application for Post-Conviction Relief, and a brief in support, in Oklahoma County District Court.  The State filed a response to the application on April 13, 2020, and Petitioner filed a reply to the State's response on April 27, 2020.  Petitioner's Application for Post-Conviction Relief and Brief in Support are attached as Exhibits 4 and 5, respectively.  The State's Response to Application for Post-Conviction Relief is attached as Exhibit 6.  Petitioner's Reply to State's Resonse [sic] for Post-Conviction Relief is attached as Exhibit 7.

On September 14, 2020, Petitioner filed a Motion for Evidentiary Hearing, and the State filed a response to the motion on September 28, 2020.  On December 21, 2020, Petitioner filed an objection to the State's response.  Petitioner's Motion for Evidentiary Hearing is attached as Exhibit 8.  The State's Response to Petitioner's Motion for Evidentiary Hearing and Supplemental *Brady* Claim is attached as Exhibit 9.  Petitioner's Objection to the State's Reponse [sic] to Motion for an Evidentiary Hearing is attached as Exhibit 10.

On March 29, 2021, Petitioner filed a Rule 3.11 Motion for Leave to Supplement the Record with Exhibit Outside the Record.  On April 16, 2021, Petitioner filed a Motion for Leave to Supplement Post-Conviction Relief.  On April 23, 2021, the Honorable Amy Palumbo, District Judge of Oklahoma County, denied Petitioner's request for post-conviction relief.  Petitioner's Rule 3.11 Motion for Leave to Supplement the Record with Exhibit Outside the Record is attached as Exhibit 11.  Petitioner's Motion for Leave to

Supplement Post-Conviction Relief is attached as Exhibit 12.  The state district court's Order Denying Application for Post-Conviction Relief is attached as Exhibit 13.

Petitioner appealed the district court's decision to the OCCA in Case No. PC-2021-549, and filed a Petition in Error and Brief in Support on June 10, 2021.  The OCCA affirmed the denial of post-conviction relief on October 11, 2021.  Petitioner's Petition in Error and Brief in Support in Case No. PC-2021-549, is attached as Exhibit 14.  The OCCA's Order Affirming the Denial of Application for Post-Conviction Relief in Case No. PC-2021-549, is attached as Exhibit 15.

5.      The petition is timely.

6.      Petitioner's Propositions I, II, IV, V, VI, XI, XII, and XIII, and a portion of Proposition IX, are unexhausted.  Respondent does not waive exhaustion.  As will be shown, the unexhausted claims in Petitioner's Propositions I, II, IV, and IX, are subject to an anticipatory bar, and the unexhausted claims in Petitioner's Propositions V, VI, XI, XII and XIII are rendered moot by the State's response to Petitioner's habeas petition.

7.      No evidentiary hearing is required.  As to Petitioner's Proposition IX, Petitioner has failed to show that a factual basis for the claims was not made in state court **and** that the facts underlying the claims would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offenses.  *See* 28 U.S.C. § 2254(e)(2).  *See also Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) (holding that evidence introduced in federal court has no bearing on § 2254(d)(1) review, and "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitations of

§ 2254(d)(1) on the record that was before that state court"); *Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012) ("[T]he Supreme Court decided in *Cullen v. Pinholster* . . . that even if a federal-court evidentiary hearing is not barred by § 2254(e)(2), the evidence so obtained is inadmissible in reviewing a claim adjudicated on the merits in state court.").

Because the OCCA did not address the merits of Petitioner's Proposition VII, this Court is not limited to the record that was before the state court in reviewing this claim. *Cf. Littlejohn v. Trammell*, 704 F.3d 817, 857 n.21 (10th Cir. 2013) (finding that because the OCCA did not adjudicate the petitioner's ineffective assistance of counsel claim on the merits, "so long as he qualifies for one, a federal evidentiary hearing may be used to develop the factual basis for his claim" and the federal courts "may consider the evidence produced in the hearing in assessing the merits of his claim, without running afoul of" *Cullen*).   Respondent has offered sufficient evidence for this Court to adjudicate Petitioner's Proposition VII without the necessity of a hearing.  *See Anderson v. Att'y Gen. of Kansas*, 425 F.3d 853, 858 (10th Cir. 2005) (observing that "an evidentiary hearing is unnecessary if the claim can be resolved on the record").

8.      Respondent has attached the relevant documents necessary for an adjudication of this matter as exhibits, and the relevant portions of the original record and the transcripts are attached as Exhibits 16 and 17, respectively.  Transcripts of a motions hearing of December 1, 2017 (Mot. Tr.), the jury trial of December 4-7, 2017 (Tr. I-IV), and the sentencing of January 30, 2018 (Sent. Tr.), and the original record, are being filed conventionally, along with the trial exhibits.  The transcript of the preliminary hearing of March 13, 2017, is available, but not relevant to the issues presented.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act, hereinafter referred to as the AEDPA, a petition for writ of habeas corpus will not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Woods v. Etherton*, 578 U.S. 113, 116-17 (2016) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).  This is intended to be a difficult standard to meet. *Richter*, 562 U.S. at 102.  "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). *See also Virginia v. LeBlanc*, __ U.S. __, 137 S. Ct. 1726, 1729 (2017) ("A proper respect for AEDPA's high bar for habeas relief avoids unnecessarily 'disturb[ing] the State's significant interest in repose for concluded litigation, den[ying] society the right to punish some admitted offenders, and intrud[ing] on state sovereignty to a degree matched by few exercises of federal judicial authority.'" (quoting *Richter*, 562 U.S. at 103) (alterations in original)); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question

under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.").

For purposes of Section 2254(d)(1), "clearly established Federal law" consists of "the holdings, as opposed to the dicta" of Supreme Court decisions. *White v. Woodall*, 572 U.S. 415, 419 (2014) (alteration and internal quote omitted). "The only federal law that can be clearly established for purposes of Smith's § 2254(d) appeal is Supreme Court precedent interpreting the Constitution." *Smith v. Dinwiddie*, 510 F.3d 1180, 1186 (10th Cir. 2007). "'The absence of clearly established federal law is dispositive under § 2254(d)(1)' and results in the denial of habeas relief." *Grant v. Royal*, 886 F.3d 874, 889 (10th Cir. 2018) (citation omitted). "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision." *Woodall*, 572 U.S. at 426 (internal quote omitted). "[A] state-court decision is an unreasonable application of . . . clearly established [Supreme Court] precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *Id.* Reversal under the AEDPA is allowed "only if a state court's decision is contrary to a Supreme Court decision, and 'circuit precedent may [not] be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule.'" *Grant v. Trammell*, 727 F.3d 1006, 1020 (10th Cir. 2013) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

The specificity of the governing legal rule determines the scope of reasonableness in its application. "[E]valuating whether a rule application was unreasonable requires

considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question." *Woodall*, 572 U.S. at 427 (internal quote omitted).

Habeas review of factual determinations under Section 2254(d)(2) is "even narrower." *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016).  The Tenth Circuit has described habeas review under Section 2254(d)(2) as "'a daunting standard— one that will be satisfied in relatively few cases.'" *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).  The AEDPA requires that federal courts give "substantial deference" to the State trial court's factual findings.  *Brumfield v. Cain*, 576 U.S. 305, 314 (2015).  For purposes of Section 2254(d)(2), "an imperfect or even an incorrect determination of the facts isn't enough . . . [a] determination must be *unreasonable*." *Grant*, 727 F.3d at 1024 (emphasis in original). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Id*. (internal quotation and alterations omitted).  *See also Ryder*, 810 F.3d at 739 (if reasonable minds might differ on the correct finding, on habeas review the court "must defer to the state court decision").

A petitioner who alleges a state court made an unreasonable determination of the facts under Section 2254(d)(2), carries the burden of proof.

> AEDPA instructs that, when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." § 2254(e)(1).

*Burt v. Titlow*, 571 U.S. 12, 18 (2013); *see also Hancock v. Trammell*, 798 F.3d 1002, 1012 (10th Cir. 2015) (petitioner bears the burden of showing an unreasonable determination of fact and that the disposition was based on a factually mistaken view of the record). Further, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Titlow*, 571 U.S. at 18 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

With this standard of review in mind, Respondent addresses Petitioner's propositions of error below.

## STATEMENT OF THE FACTS[1]

On July 20, 2016, agents from the Oklahoma Bureau of Narcotics ("OBN") and officers with the Oklahoma City Police Department, working together, arrested Petitioner at the Biltmore Hotel in Oklahoma City for human trafficking (Tr. II 33, 45-46, 68-73, 202-06). A short time earlier, the agents had detained Leticia Hudson and A.H. at a Motel 6 along I-35 in Oklahoma City (Tr. II 44, 198). The women were detained after agreeing to perform sex acts with undercover OBN Agent Jack Forney (Tr. II 34-44, 197-98). The

---

[1] In large part, the facts are those that were presented by the State on direct appeal (Exhibit 2 at 1-10).

women told Agent Blaine Phillips they had been trying to escape their pimp (Tr. II 198). A.H., upset, withdrawn and afraid, described Petitioner, whom she knew only as Milton, and the car he drove, and told the agents where they could find him (Tr. II 200-01, 219). The women also described a woman who would be found with Petitioner, Michelle Barton, who was about eight months pregnant (Tr. II 73, 201). A.H.'s information was accurate. Petitioner, Michelle Barton, and a third woman were arrested at the Biltmore Hotel (Tr. II 45-46, 68-73, 202-06).

A.H. had met Petitioner earlier that July at a Motel 6 in Tulsa, where she had been staying with Tara, her aunt's friend, in exchange for watching Tara's three children during the day (Tr. II 82-85). A.H. had recently turned eighteen and aged out of the foster care system which she was in up until that time (Tr. II 83). In the early morning hours of the night A.H. met Petitioner, he invited her and K., her fifteen-year-old friend, to his motel room (Tr. II 88-93). There, Petitioner and K. smoked marijuana, but A.H. did not smoke (Tr. II 95). Petitioner asked A.H. if there was something else she liked, and she told him she liked methamphetamine (Tr. II 95). Petitioner then made a phone call and had someone bring methamphetamine to the motel room (Tr. II 95). A.H. did not pay Petitioner for the methamphetamine, and he did not tell her she owed him anything (Tr. II 95-96). A.H. used the methamphetamine that night and got high (Tr. II 96).

Petitioner then began telling A.H. that she was "smarter than this, . . . better than this," and "really pretty." (Tr. II 96). While A.H. was still under the influence of methamphetamine, Petitioner told her she should not be hanging around a motel, and there were other things that she could be doing that would allow her to make money and get

9

clothes and makeup (Tr. II 96, 98).  Petitioner did not have to spell it out for A.H. (Tr. II 96).  She knew there were only two options "when somebody's telling you there's something that you could be doing to make money," either dealing drugs or being a prostitute (Tr. II 96-97).  Because he kept telling her she was beautiful, she knew he was not talking about having her sell drugs (Tr. II 97).  Petitioner told her he could help her out with money if she came with him (Tr. II 97).

A.H.'s identification, Social Security card, and birth certificate had been lost while she was in foster care (Tr. II 100).  Unable to get a job and feeling as though her only other option was to watch Tara's children, A.H. agreed to travel to Oklahoma City with Petitioner (Tr. II 98, 100-01).  Her understanding was that they would be working together, with him getting her what she needed, her performing sexual acts with people in exchange for money, and that they would split the money she made (Tr. II 98-99).  Before going to Oklahoma City, they went to a Walmart in Tulsa where Petitioner bought A.H. tank tops, jean-leggings, bras, underwear, toiletries, and makeup (Tr. II 97, 99).

After A.H., still under the influence of the methamphetamine, showered at the motel and did her hair and makeup, she and Petitioner drove to Oklahoma City in his car (Tr. II 101-02).  After two stops at the homes of two of Petitioner's friends in Oklahoma City, they went with one of his friends to Ross (Tr. II 102-04).  There, Petitioner bought A.H. more clothing: several pairs of jeans, some tops, a lingerie set, and some shoes (Tr. II 104-05).  A.H. did not ask Petitioner to buy her the clothes, and he did not tell her she owed him for them (Tr. II 105-06).  Instead, Petitioner told A.H. she would need the clothes, that "[n]obody's gonna want to be with somebody who doesn't look like they're looking great,"

10

that "[n]obody wants to date somebody who's all run down and looking bad," and "[t]hat's how you're gonna make your money is looking nice." (Tr. II 104-06).  To "make a date" meant to "[s]et up an appointment to engage in sexual activity in exchange for money." (Tr. II 105).

After leaving Ross, Petitioner took A.H. to an Americas Best Value Inn motel at I-40 and Meridian in Oklahoma City (Tr. II 106-07).  Petitioner rented a room for A.H. for the sole purpose that she would have a place to perform sexual acts in exchange for money (Tr. II 107-08).  A.H. did not ask Petitioner to rent the room for her (Tr. II 108).  There, Petitioner told A.H. that another woman who worked for him would be in touch with her to help her write an online ad which would draw attention and generate dates (Tr. II 109).  While this woman helped A.H. choose which words to use, Petitioner helped her choose which photographs to use (Tr. II 109-12).  Petitioner gave A.H. one of his phones to use to post her ad on Backpage, a website known for prostitution (Tr. II 34, 110, 112-13, 161).  Petitioner, A.H., and the woman who heled her write the ad, together determined what A.H.'s prices would be (Tr. II 116).  In response to the ad, people started calling Petitioner's phone, which number she had listed (Tr. II 114-15).  A.H. made arrangements with these callers to come to the Americas Best Value Inn, where she performed sexual acts with them in exchange for money (Tr. II 115-17).

In a little more than twenty-four hours at the motel, A.H. had more than ten dates in which she performed sexual acts in exchange for money (Tr. II 117-18).  Per Petitioner's instruction, whenever A.H.'s dates paid her, she placed the money in a bedside drawer (Tr. II 118-19).  Upon making $200 to $300, she would tell Petitioner and he would come pick

11

up the money (Tr. II 118-19).  Petitioner's reasoning was that it was safer not to have a large amount of money in her possession in case one of her dates robbed her (Tr. II 119). A.H.'s understanding of the working agreement between her and Petitioner was that she would keep some of the money she made, but Petitioner took every dollar that was paid to her and did not give her any of it (Tr. II 98-99, 119-20).  When it became clear to her that she would not be keeping any of the money she was being paid in exchange for sex acts, A.H. wanted to leave the motel, but she felt there would be repercussions if she did so, even though Petitioner had not said anything outright (Tr. II 182).

While A.H. was at the Americas Best Value Inn, Petitioner supplied her with methamphetamine, though she never asked him to get it for her (Tr. II 123).  When Petitioner would come to pick up the money A.H. had made, or to bring her food, he would ask her, "Are you good, do you need anything else?" (Tr. II 123-24).  As he had already brought her food and asked her if she needed any more condoms, A.H. knew that with that question, Petitioner was asking her if she "need[ed] anything else to keep [her] up to continue making [her] dates" (Tr. II 124).  In the time they were together, Petitioner was A.H.'s only source of methamphetamine (Tr. II 181-82).  During the approximately one and a half days that she stayed at the Americas Best Value Inn, A.H. left the motel only one time, when Petitioner took her to Taco Bell because she was hungry (Tr. II 124).  "All the other times [she] was either making dates or waiting for dates to call."  (Tr. II 124).

One of A.H.'s dates at the Americas Best Value Inn claimed to be a police officer (Tr. II 124).  He then told her he was not really an officer and was only trying to scare her (Tr. II 124).  He did scare A.H., prompting her to contact Petitioner and tell him she needed

to leave the motel (Tr. II 125).  It was when she was leaving that motel that she met Michelle,[2] Petitioner's "top girl," or "top bitch," and the person A.H. was supposed to contact if she could not reach Petitioner (Tr. II 121-23).  Petitioner moved A.H. to the nearby Biltmore Hotel, also at I-40 and Meridian in Oklahoma City (Tr. II 66, 125).

At the Biltmore, Petitioner did not rent A.H. a separate room, and she stayed in the same room with Petitioner and Michelle (Tr. II 125-26).  There, Petitioner repeatedly asked A.H. if she had re-posted her ad, and her answer was always yes (Tr. II 126).  However, her ad did not result in any calls for dates at the Biltmore, and when Petitioner realized her ad was not working, he became agitated and upset (Tr. II 127).  Petitioner never spoke of a legitimate job, and A.H. did not know of any source of income for Petitioner other than the money she and other prostitutes gave him (Tr. II 127).

It was at the Biltmore Hotel that A.H. met Leticia Hudson (Tr. II 128).  A.H. and Petitioner were sitting outside at the back of their room when Ms. Hudson walked by (Tr. II 128).  A.H. asked her if she had a lighter and Ms. Hudson said she had one in her room (Tr. II 128-29).  After letting Petitioner know where she was going, A.H. went with Ms. Hudson to her room to use the lighter, but she ended up staying there the whole night (Tr. II 129-31).  A.H. told Ms. Hudson that she did not want to work as a prostitute anymore and just wanted to go home; Ms. Hudson told A.H. to stay with her, and that she would lock the door and find a way to get A.H. home (Tr. II 130-31).  By this time, A.H. had been working as a prostitute for Petitioner for about a week (Tr. II 131).

---

[2] This was the Michelle Barton, who was arrested with Petitioner, though A.H. only referred to her by her first name (Tr. II 72-73, 201, 206).

Petitioner began calling A.H., first about once per hour, but because she rejected his calls, he started calling her "frantically." (Tr. II 131-32). Petitioner and Michelle then came to Ms. Hudson's room where Michelle banged and kicked on the front door of the room, and Petitioner did the same to the back door of the room (Tr. II 132). Michelle told them they needed to open the door or she would "kick [their] ass[es]" and Petitioner called A.H.'s name, asking her what was going on and to open the door (Tr. II 132). After twenty to thirty minutes, hotel security arrived (Tr. II 132-33). Petitioner left, but Michelle remained (Tr. II 133). When Ms. Hudson opened the door to speak to security, Michelle punched through the space created by the open door, hit Ms. Hudson in the face, and took Ms. Hudson's phone out of her hand (Tr. II 133-34). Knowing Michelle was after the phone Petitioner had bought for A.H., A.H. gave her that phone and took Ms. Hudson's back (Tr. II 134).

Petitioner returned to the back door of Ms. Hudson's room after security left, prompting Ms. Hudson to call a person she knew as V.P. (Tr. II 135). After V.P. arrived with a gun and had a conversation with Petitioner, Petitioner left, yelling to A.H, "You're gonna get yours." (Tr. II 135-36, 139). She understood Petitioner's words to mean something was going to happen to her for her choice, and she "didn't want to stick around to find out what it was." (Tr. II 139). A.H. took Petitioner's words as a threat that he would beat her if she stopped making money for him (Tr. II 158-60).

Though A.H. thought V.P. was just helping them out with Petitioner, he told them that in exchange for his assistance, they would now work for him, meaning they would still perform sexual acts in exchange for money, but the money would go to him (Tr. II 136-

14

37).  A.H. and Ms. Hudson had one date each while at the Biltmore, earning about $80 (Tr. II 137-38).  V.P. was supposed to come back the next morning for his money, but the women left the Biltmore during the night without telling anyone (Tr. II 137, 139).

Ms. Hudson called a friend who gave them a ride to a Motel 6 in Oklahoma City, where Ms. Hudson rented a room for her and A.H. (Tr. II 140-41).  A.H. took a shower and went to sleep (Tr. II 141).  Ms. Hudson woke her up to tell her she had posted an ad for a "two-girl special" and made a date with someone for $200 (Tr. II 141).  Their plan was to do one date, split the $200, and A.H. would be able to go back to Tulsa (Tr. II 149).  Ms. Hudson showed A.H. a photograph of their date, and A.H.'s response to her was, "He is a cop." (Tr. II 142).  A.H. was correct.  Their date turned out to be Agent Forney, and he was in their room for about five minutes before law enforcement authorities entered (Tr. II 142-43).  After speaking to Agent Phillips, A.H. went to a shelter for human trafficking victims in Tulsa (Tr. II 60-61, 144-46, 202, 219).  A.H. promised Agent Phillips she would stay at the shelter for twenty-four hours, and that is exactly how long she stayed (Tr. II 146).  She left the shelter because she was afraid someone would come looking for her there (Tr. II 146).

On July 23, 2016, Petitioner made a phone call while in the Oklahoma County Jail, the recording of which was admitted by stipulation as State's Exhibit 1 (Tr. II 186-87).  In the phone call with a person Petitioner referred to as his cousin, Petitioner said the police told him he was being arrested for human trafficking (State's Ex. 1 at 1:48-1:56).[3]  The

---

[3] Times cited are approximate.

cousin asked if Petitioner had spoken to Michelle, but Petitioner told him Michelle would not say anything about him regarding human trafficking (State's Ex. 1 at 2:00-2:23). Petitioner wondered how they could get him for human trafficking, and stated there had to be a victim to say he was doing this (State's Ex. 1 at 3:04-3:20, 3:25-3:35, 4:12-4:30, 16:30-16:35). More than once, Petitioner stated that "they gotta find the trick that I did it with" (State's Ex. 1 at 16:36-16:39; *see also* State's Ex. 1 at 6:10-6:19, 6:19-6:22). A "trick" was a way for a pimp to refer to his prostitutes (Tr. II 193). Agent Phillips understood Petitioner's statement to mean that Petitioner was "looking for the girl that he prostituted out that is talking to police." (Tr. II 213-14). Agent Phillips had no reason to believe that Petitioner knew that A.H. had been caught or had spoken to authorities at the time of the phone call (Tr. II 211-12). Other facts will be presented as they relate to Petitioner's propositions.

## ARGUMENT AND AUTHORITY

Petitioner raises the following propositions of error in his habeas petition:

1. "Appellate counsel deprived Petitioner of the effective assistance for failing to show Petitioner was factually innocent of the accused crime."

2. "Appellate counsel was ineffective for failing to raise the warrantless arrest lacked probable cause."

3. "The trial court allowed an improper instruction that violated Mr. Shelton's right to present a defense and to a fair and impartial trial by jury."

Doc. 1 at 5, 18, 22 (grammar and syntax in original, random capitalization omitted). In his Motion to Supplement, Petitioner raises the following additional claims:

4. "Appellate counsel was ineffective for failing to raise the claim when the State failed to file a brief in opposition or list of authorities opposing Mr.

16

Shelton's motions and letters stamped filed pursuant to title 12 Ch. 2 app. rule 4(e); Ok. Const. Art. 2 § 20; Title 22 O.S. § 13, the Oklahoma County district court lost its subject matter jurisdiction and authority to impose valid judgment."

5. "Appellate counsel was ineffective for failing to raise the claim the trial court committed plain error denying a constitutional right to a preliminary examination on the charge of Pandering, allowing the jury to debate on alternative theories or charges."

6. "Appellate counsel was ineffective for not raising the claim, the record demonstrates a high possibility of a civil rights violation, the same being a Brady violation."

7. "Newly discovered evidence.  The trial court abused its discretion when Judge Henderson showed bias by favoring the female assistant district attorney, ignoring obvious statutory laws, constitutional laws and playing a dual role of both preliminary judge and trial judge."

8. "The trial court erred by not giving an instruction defining 'Human Trafficking' in violation of Mr. Shelton's constitutional right to a fair trial."

9. "Because the evidence was insufficient to support Mr. Shelton's conviction for human trafficking for commercial sex, due process requires his case to be reversed and remanded with instructions to dismiss."

11. "Prosecutorial misconduct for failure to disclose secret relationship with Judge Henderson."

12. "Ineffective assistance of appellate counsel for failing to raise the claim, trial counsel failed to investigate and raise secret sexual relationship between Judge Henderson and ADA's Collins and McConnell."

13. "Ineffective assistance of appellate counsel."

Doc. 5 at 2-6 (grammar and syntax in original, random capitalization omitted).[4]

Respondent concedes that Petitioner's Proposition VII requires federal habeas relief

in the form of a new trial.  Respondent's concession renders Petitioner's Propositions III,

---

[4] Petitioner has not raised a Proposition 10.

V, VI, VIII, XI, XII, and XIII moot.  This leaves Petitioner's Propositions I, II, IV, and IX, as hypothetical relief on these propositions would preclude a second trial.  Respondent shows herein that the OCCA's decision to deny Petitioner relief on his Proposition IX was neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record.  Respondent further shows that Petitioner's Propositions I, II, and IV, and a portion of Proposition IX, are unexhausted, but subject to an anticipatory procedural bar.  Accordingly, while Petitioner is entitled to a writ of habeas corpus ordering a second trial, he is not entitled to a writ precluding a second trial.

## PROPOSITION I

**RESPONDENT CONCEDES THAT HABEAS RELIEF IS REQUIRED ON PETITIONER'S CLAIM THAT HE WAS DENIED A FAIR TRIAL BY THE UNDISCLOSED CONDUCT OF THE JUDGE WHO PRESIDED OVER PETITIONER'S TRIAL WITH THE PROSECUTOR WHO REPRESENTED THE STATE IN PETITIONER'S CASE, WHICH WAS ONGOING AT THE TIME OF PETITIONER'S TRIAL.**

**(In partial response to Petitioner's Proposition VII.)**

In his Proposition VII, Petitioner claims that the "sexual misconduct and sexual relationship" of former Judge Timothy Henderson, the judge who presided over his trial, with Kelly Collins, the Assistant District Attorney who prosecuted Petitioner in this case, denied Petitioner a fair trial.  Doc. 5 at 5.  For the reasons set forth below, Petitioner is entitled to federal habeas relief on this claim.

Petitioner raised this claim during post-conviction proceedings in state district court, in a Motion for Leave to Supplement Post-Conviction Relief (Exhibit 12).  In his appeal of the denial of post-conviction relief, Petitioner claimed:

> In the case at bar, Petitioner Shelton was prejudiced by the Trial Judge Timothy Henderson's sexual misconduct and sexual relationship with Assistant District Attorney Kelly Collins.  Kelly Collins was the Assistant District Attorney that presided over Petitioner's Trial.  In the least, the personal relationship between the Trial Judge and Collins affected the integrity of the judicial proceedings, resulting in a gross miscarriage of justice.  Hogan v. State, 2006 OK CR 19 ¶ 38, 139 P.3d 907, 923 (holding, "we will only grant relief if the error seriously affects the (1) fairness, (2) integrity, (3) public reputation of the judicial proceedings (4) or otherwise represents a miscarriage of justice").

(Exhibit 14 at 12 (grammar, syntax, and capitalization in original)).  In support of his claim, Petitioner cited an administrative order of March 26, 2021, suspending Henderson from presiding over any court docket or conducting any court proceedings, as well as a news report from the same date, in which it was reported that Henderson was expected to resign (Exhibit 14 at 13).  In his proposition heading, Petitioner alerted the OCCA that this was a "new discovery" (Exhibit 14 at 12 (capitalization omitted)).  However, the OCCA found the claim was procedurally barred from review:

> All of the propositions Petitioner asserts in this post-conviction proceeding either were or could have been raised and adequately addressed during his trial or in his direct appeal.  The issues are therefore waived or procedurally barred.  22 O.S.2011, § 1086; *Logan* [*v. State*, 2013 OK CR 2, ¶ 3, 293 P.3d 969, 973].   Petitioner offers no reason why the propositions were not previously raised, and thus this Court does not find sufficient reason to allow Petitioner's propositions to be the basis of this application for post-

conviction relief. 22 O.S.2011, § 1086; *see also Davis* [*v. State*, 2005 OK CR 21, ¶ 2, 123 P.3d 243, 244].

(Exhibit 15 at 2).

The OCCA's application of a procedural bar to Petitioner's post-conviction claim that he was denied a fair trial because of Henderson's sexual conduct with one of the prosecutors that was ongoing during his trial was incorrect. Contrary to the OCCA's finding, Petitioner's claim in this regard could not have been raised on direct appeal, and he offered a reason why it was not previously raised: because it was newly discovered in March of 2021. Thus, under these very specific circumstances, federal habeas review of the claim is not barred, and this Court should apply *de novo* review without deference under 28 U.S.C. § 2254(d). *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (stating that "if the state court did not decide a claim on the merits, and the claim is not otherwise procedurally barred, we address the issue de novo and the § 2254(d)(1) deference requirement does not apply"). *See also Cone v. Bell*, 556 U.S. 449, 472 (2009) (observing that because the state court did not reach the merits of the petitioner's claim, federal habeas review was not subject to Section 2254(d) deference, and instead the claim would be reviewed *de novo*); *Williams v. Trammell*, 782 F.3d 1184, 1191 (10th Cir. 2015) ("We review de novo claims that the state court did not adjudicate on the merits."). A *de novo* review of Petitioner's claim leads to the conclusion that he is entitled to federal habeas relief in the form of a new trial on this issue.

Because the OCCA did not adjudicate the merits of Petitioner's claim, 28 U.S.C. § 2254(d) does not limit this Court's consideration of the issue to the record that was before

the State court.  *See Littlejohn v. Trammell*, 704 F.3d 817, 857 n.21 (10th Cir. 2013) (finding

that because the OCCA did not adjudicate the petitioner's ineffective assistance of counsel

claim on the merits, "so long as he qualifies for one, a federal evidentiary hearing may be

used to develop the factual basis for his claim" and the federal courts "may consider the

evidence produced in the hearing in assessing the merits of his claim, without running afoul

of" *Cullen*).   On this basis, Respondent offers evidence adduced in the direct appeal of

*Robert Leon Hashagen, III v. State of Oklahoma*, OCCA Case No. F-2021-203, in which

the conduct between Henderson and Ms. Collins was the subject of an evidentiary hearing

and subsequent findings of fact and conclusions of law by the state district court.

On October 11, 2021, the OCCA issued an Order Remanding for Evidentiary

Hearing and Holding Further Briefing in Abeyance in *Hashagen*.  The Order Remanding

for Evidentiary Hearing and Holding Further Briefing in Abeyance in Case No. F-2021-

203, is attached as Exhibit 18.  Before his brief in chief was filed, Mr. Hashagen's appellate

counsel filed a motion for new trial and request for an evidentiary hearing, alleging as

follows:

> In the motion for new trial, Appellant alleges the
> existence of a previously undisclosed sexual relationship
> between Judge Henderson and the prosecutor Kelly Collins.
> Appellant attaches several non-record exhibits detailing Judge
> Henderson's abrupt resignation from the bench effective April
> 5, 2021, amidst an ongoing criminal investigation into his
> alleged sexual contact with at least three female attorneys, one
> of whom was identified in an unsealed search warrant
> application as Collins.  Based upon these exhibits, Appellant
> claims "that he can establish that within the last five years,
> including during at least part of the pendency of this case in the
> court below, the judge who presided over his trial engaged in a

sexual relationship with at least one of the prosecutors in his case." Motion at 10.

(Exhibit 18 at 3).  The OCCA found the allegations in Mr. Hashagen's motion required fact finding and remanded the case to the District Court of Oklahoma County for an evidentiary hearing (Exhibit 18 at 6).

The evidentiary hearing in *Hashagen* was held on November 15, 2021, and was presided over by the Honorable Paul Hesse, District Judge.  The transcript of November 15, 2021, evidentiary hearing, is attached as Exhibit 19.  At the evidentiary hearing, a stipulation from Henderson was admitted as Court's Exhibit 1, and a stipulation from Ms. Collins was admitted as Court's Exhibit 2 (Exhibit 19 at 4).  The Stipulations of Tim Henderson is attached as Exhibit 20.  The Stipulation of Testimony of Kelly Collins is attached as Exhibit 21.  In their respective stipulations, both Henderson and Ms. Collins agreed that they had sexual contact between April of 2016 and August of 2018 (Exhibit 20 at 2; Exhibit 21 at 1).[5]

Clay Curtis, one of Mr. Hashagen's defense attorneys, testified in the hearing that prior to the start of Mr. Hashagen's trial in January 2021, he did not have any knowledge of any kind of "intimate relationship" between Ms. Collins and Henderson, and had he been aware, he would have asked Henderson "to recuse from the case, potentially filed a motion to disqualify."  (Exhibit 19 at 6).  Mr. Curtis went on to testify that "based on the

---

[5] Henderson and Ms. Collins disagree on the nature of the conduct.  While Henderson describes it as a "consensual sexual affair," Ms. Collins describes what Henderson subjected her to as sexual abuse (Exhibit 20 at 1; Exhibit 21 at 1-2).

number of cases [he] had involving the two of them, I think you could pretty much rest assured I would have filed some judicial and ethical bar complaints against both of them." (Exhibit 19 at 6).  Lori McConnell, one of the three Assistant District Attorneys who, along with Ms. Collins, represented the State in *Hashagen*, likewise testified at the hearing that she had no knowledge of any kind of a relationship between Ms. Collins and Henderson (Exhibit 19 at 92-93).   Mr. Curtis was also one of Petitioner's attorneys, and Ms. McConnell represented the State in Petitioner's case along with Ms. Collins (Tr. I 3).

Judge Hesse subsequently issued Findings of Fact and Conclusions of Law, filed on December 20, 2021.  The Findings of Fact and Conclusions of Law are attached as Exhibit 22.  Judge Hesse found that Ms. Collins was one of three prosecutors assigned to Mr. Hashagen's case, and that "Henderson and Collins were involved" at the time of Mr. Hashagen's pretrial conference of January 17, 2018, "in a years-long, secret sexual relationship.  This relationship began in April 2016 and ended sometime during the summer of 2018." (Exhibit 22 at 2-3).  The relationship ended prior to Mr. Hashagen's trial, which was held on January 25, 2021, through February 2, 2021 (Exhibit 22 at 3).  Judge Hesse found Ms. Collins was "substantially involved" in a pretrial hearing of January 21, 2021, and "conducted the direct examination of several State witnesses, cross-examined two defense witnesses, and gave the State's first closing argument" at Mr. Hashagen's trial (Exhibit 22 at 2-3).  Neither Henderson nor Ms. Collins disclosed to Mr. Hashagen or his attorneys that they had been involved in a sexual relationship with each other (Exhibit 22 at 3).  Mr. Hashagen and his attorneys were unable to request that Henderson recuse from

Mr. Hashagen's trial because the relationship was unknown to them, but they would have made such a request if they had known of the relationship (Exhibit 22 at 3-4).

Judge Hesse made the following conclusions of law concerning Mr. Hashagen's case:

> 5.      There are certain circumstances as an objective manner that require recusal of a judge when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872, 129 S. Ct. 2252, 2257 [2009] (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 1464 (1975)).   A past or current sexual relationship between a prosecutor and a judge is one of those circumstances.   The existence of such an intimate relationship casts grave doubt on the impartiality of the judge and severely taints the rulings by the judge.

> 6.      It is immaterial in this case that the sexual relationship between Henderson and Collins ended prior to Henderson's rulings on the pretrial motions and trial.   An unconstitutional potential for bias existed because Henderson could not have been neutral if he still had romantic feelings for Collins or if he feared that Collins might disclose their relationship out of frustration if she was dissatisfied with a ruling.   The facts of this case are sufficient to raise an "unconstitutional potential for bias." *Caperton*, 556 U.S. 868, 881.

> 7.      A new trial is the only adequate remedy to redress the Defendant's denial of due process of law.   Also, a new trial is necessary in order to preserve the integrity and reputation of our judicial system.

(Exhibit 22 at 5).   Judge Hess concluded that Mr. Hashagen "was denied due process and recommend[ed] that he be granted a new trial by the Court of Criminal Appeals."   (Exhibit 22 at 6).   The appeal in *Hashagen* is currently pending before the OCCA, with the State's direct appeal brief due on or before May 21, 2022.

Respondent respectfully requests that this Court consider the evidence adduced in *Hashagen* and apply it to Petitioner's claim.   Given that one of Petitioner's defense attorneys, Mr. Curtis, and the second prosecutor, Ms. McConnell, testified at Mr. Hashagen's evidentiary hearing to their lack of knowledge of any sexual conduct between Henderson and Ms. Collins in 2021, over three years after Petitioner's trial in 2017, there is no reason to believe that evidence adduced in an evidentiary hearing in this particular case would be any different.

The docket sheet for the instant case reflects that Henderson was assigned to Petitioner's case on August 5, 2016 (O.R. 201).   Ms. Collins's first appearance in Petitioner's case was on September 1, 2017, when she checked out the transcript of the preliminary hearing (O.R. 205).   Petitioner's trial was held on December 4-7, 2017.   Ms. Collins and Ms. McConnell represented the State at the trial, and Mr. Curtis and Sammy Duncan represented Petitioner (Tr. I 3).

Ms. Collins was substantially involved in the prosecution of Petitioner.   Ms. Collins argued for the State in the motions hearing of December 1, 2017 (Mot. Tr. 5-25).   Ms. Collins argued the pretrial motions on the first day of trial, conducted the direct examination of three State's witnesses on the second day of trial, delivered the State's first closing argument in the first stage of trial on the third day, and delivered the State's final closing argument in the second stage of trial on the fourth and final day (Tr. I 3-29; Tr. II 63-77, 81-151, 181-83, 188-220, 237-38; Tr. III 30-44; Tr. IV 43-44).

Based on the stipulations of Henderson and Ms. Collins in *Hashagen*, their sexual conduct, which lasted from April of 2016 until August of 2018, was undisclosed and

ongoing from the time both Henderson and Ms. Collins entered Petitioner's case, and continued through his trial in December of 2017, and his sentencing on January 30, 2018.

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). *See also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009) (quoting *Murchison*, 349 U.S. at 136). "Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *Murchison*, 349 U.S. at 136. Petitioner has not shown any actual bias on the part of Henderson which affected his trial. However, "the Due Process Clause may sometimes demand recusal even when a judge 'ha[s] no actual bias.'" *Rippo v. Baker*, __U.S.__, 137 S. Ct. 905, 907 (2017) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986)). "To establish an enforceable and workable framework, the [Supreme] Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016). "The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is likely to be neutral, or whether there is unconstitutional potential for bias.'" *Id.* (quoting *Caperton*, 556 U.S. at 881 (further internal quotation marks omitted)). *See also Caperton*, 556 U.S. at 572 (finding recusal is required "when 'the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable'" (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975))).

"Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself." *Williams*, 579

U.S. at 16.  As found by Judge Hesse in *Hashagen*, "[a] past or current sexual relationship between a prosecutor and a judge is one of those circumstances" in which "'the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable.'"  (Exhibit 22 at 5 (quoting *Caperton*, 556 U.S. at 872)).  That conclusion is only reinforced where, as here, the conduct was ongoing at the time of Petitioner's trial. Respondent concedes that under the facts of this case, there exists an "'unconstitutional potential for bias.'"  *Williams*, 579 U.S. at 8 (quoting *Caperton*, 556 U.S. at 881).  This constitutional violation is not subject to a harmless error analysis.  *See Tumey v. Ohio*, 273 U.S. 510, 535 (1927) ("No matter what the evidence was against [the accused], he had the right to have an impartial judge.").  *See also Ruiz v. United States*, 990 F.3d 1025, 1030 (10th Cir. 2021) (recognizing the violation of the right to an impartial judge as one of the constitutional errors which "remain so intrinsically damaging and basic to our trial system as to never be harmless" (citing *Tumey*)).

Respondent's position should be narrowly construed to the facts at hand.  Although Petitioner has not shown any bias that had any effect on the trial, under the available evidence and the facts of Petitioner's case (including, but not limited to, Ms. Collins's particular, substantial involvement at his trial), the timing of Henderson's conduct with Ms. Collins "casts grave doubt on the impartiality" of Henderson and "severely taints the rulings" by him (Exhibit 22 at 5).  Because Petitioner "had the right to have an impartial judge," Respondent concedes his case should be reversed and remanded for a new trial. *Tumey*, 273 U.S. at 535 (finding a violation of the right to an impartial judge, and reversing and remanding the case "for further proceedings not inconsistent with this opinion").  *See*

*also State v. Wakefield*, 751 S.E.2d 199, 204, 206 (Ga. Ct. App. 2013) (affirming the grant of new trials for five defendants where the judge violated state statutory disqualification rules by "engag[ing] in an undisclosed sexual relationship with [a public defender] while presiding over" their trials).  Petitioner is entitled to no further relief.

## PROPOSITION II

**PETITIONER'S PROPOSITIONS III, V, VI, VIII, XI, XII, AND XIII ARE RENDERED MOOT BY RESPONDENT'S CONCESSION THAT FEDERAL HABEAS RELIEF IS WARRANTED.**

**(In response to Petitioner's Propositions III, V, VI, VIII, XI, XII, and XIII).**

In his Proposition III, Petitioner claims the trial court issued an improper jury instruction that violated his right to present a defense, and denied him a fair trial.  Doc. 1 at 22.  In his Proposition V, he claims appellate counsel was ineffective for failing to raise the claim that the trial court erred in denying him a preliminary hearing on the alternative charge of Pandering.  Doc. 5 at 2-3.  In his Proposition VI, Petitioner claims appellate counsel was ineffective for raising the claim of a civil rights violation, "the same being a Brady violation,"[6] concerning alleged audio recordings of A.H. and Ms. Hudson, and text messages from V.P.  Doc. 5 at 3.  In his Proposition VIII, Petitioner claims the trial court erred in failing to submit a jury instruction defining "human trafficking".  Doc. 5 at 5.  In his Proposition XI, he raises a claim of "[p]rosecutorial misconduct for failure to disclose secret relationship with Judge Henderson."  Doc. 5 at 6 (grammar and syntax in original).

---

[6] Petitioner seems to be referencing *Brady v. Maryland*, 373 U.S. 83 (1963).

In his Proposition XII, he claims appellate counsel was ineffective for failing to raise a claim that trial counsel was ineffective for failing to "investigate and raise secret sexual relationship between Judge Henderson and ADA's Collins and McConnell." Doc. 5 at 6 (grammar and syntax in original). Finally, in his Proposition XIII, Petitioner claims that appellate counsel was ineffective, but does not state on what grounds. Doc. 5 at 6. These claims are rendered moot by Respondent's concession in its Proposition I that Petitioner is entitled to federal habeas relief in the form of a new trial.[7]

"Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.' Accordingly, '[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and

---

[7] Petitioner's Propositions V, VI, XI, XII, and XIII are also unexhausted. Respondent does not waive exhaustion. Although Petitioner raised the substantive issues which are the subject of his Propositions V and VI to the OCCA in his post-conviction appeal, he did not raise them as grounds of ineffective assistance of appellate counsel (Exhibit 14 at 3, 9-11). While Petitioner claimed he was denied a fair trial by the undisclosed sexual relationship between the judge and the prosecutor in his post-conviction appeal, he has not presented to any state court any claim that the prosecutor committed misconduct in failing to disclose the relationship, or that appellate counsel was ineffective for failing to present a claim that trial counsel was ineffective for failing to investigate the relationship (Exhibit 14 at 12-15). *See Grant v. Royal*, 886 F.3d 874, 891 (10th Cir. 2018) (stating that "there is no fair presentation if the claim before the state court was only 'somewhat similar' to the claim pressed in the habeas petition" (citation omitted). Petitioner has not raised his claim in his Proposition XIII to any state court. *See Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994) ("The exhaustion requirement is satisfied if the federal issue has been properly presented to the highest state court, either by direct review of the conviction or in a post-conviction attack."). These claims would be subject to an anticipatory procedural bar if Petitioner returned to state court to raise them in a second post-conviction application. *See Grant*, 886 F.3d at 892 ("Where the relevant state courts 'would now find those claims procedurally barred, there is a procedural default for the purposes of federal habeas review.'" (citation omitted)). However, as set forth above, these claims have been rendered moot by Respondent's concession in its Proposition I, and further discussion of them is unnecessary.

likely to be redressed by a favorable judicial decision.'" *Chafin v. Chafin*, 568 U.S. 165, 171-72 (2013) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)). "Federal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Id.* at 172 (quoting *Lewis*, 494 U.S. at 477). "The 'case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.'" *Id.* (quoting *Lewis*, 494 U.S. at 477). "'[I]t is not enough that a dispute was very much alive when suit was filed'; the parties must 'continue to have a "personal stake"' in the ultimate disposition of the lawsuit." *Id.* (quoting *Lewis*, 494 U.S. at 477-78). Therefore, there is "no case or controversy, and a suit becomes moot, 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Id.* (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

A favorable decision on any or all of the claims raised in Petitioner's Propositions III, V, VI, VIII, XI, XII, and XIII, would result in a new trial for Petitioner. However, Respondent has conceded in Proposition I that a new trial is warranted based on Petitioner's claim concerning the undisclosed sexual relationship between Henderson and one of the prosecutors that was ongoing at the time of Petitioner's trial. In light of Respondent's concession, Petitioner no longer has a "personal stake" in the disposition of these propositions, and any decision rendered by this Court on them would amount to an "'opinion advising what the law would be upon a hypothetical state of facts.'" *Chafin*, 568 U.S. at 172 (quoting *Lewis*, 494 U.S. at 477-78). This Court should therefore find

Petitioner's Propositions III, V, VI, VIII, XI, XII, and XIII moot, and decline to review them further.

## PROPOSITION III

**THE DECISION BY THE OCCA THAT THE STATE PRESENTED SUFFICIENT EVIDENCE TO SUSTAIN PETITIONER'S CONVICTION FOR HUMAN TRAFFICKING FOR COMMERCIAL SEX WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, FEDERAL LAW, NOR WAS IT AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE STATE COURT RECORD.**

### (In partial response to Petitioner's Proposition IX.)

In Proposition IX, Petitioner claims the State presented insufficient evidence to convict him of Human Trafficking for Commercial Sex. Doc. 5 at 5-6. Petitioner raised this claim on direct appeal as his second proposition of error, and the OCCA denied it on the merits (Exhibit 1 at 12-21; Exhibit 3 at 3-4). The OCCA's decision was neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record.

On direct appeal, the OCCA denied Petitioner's claim that the State presented insufficient evidence to support his conviction for Human Trafficking for Commercial Sex:

> As to Proposition II, the complaining witness, A.H., testified that [Petitioner] recruited her as a prostitute, drove her from Tulsa to Oklahoma City, bought her clothing and other personal items, supplied her with methamphetamine, helped her set up an online personals ad to attract customers, provided her with motel rooms in which to conduct business, and confiscated the money she made from performing sex acts with strangers. She testified that at the time she agreed to work for [Petitioner], she was homeless, jobless, and penniless, and felt she had no other option. The jury was well aware that A.H.

31

was not *physically* forced to work for [Petitioner]; its verdict that [Petitioner's] actions nevertheless amounted to "coercion" as defined in 21 O.S. § 748 is supported by competent evidence. *Jessie v. State*, 1982 OK CR 99, ¶¶ 2-3, 648 P.2d 46, 46-47. Proposition II is denied.

(Exhibit 3 at 3-4). The factual findings made by the OCCA in this matter are presumed correct because Petitioner has not rebutted those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a State court shall be presumed correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"); *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) ("factual findings of the state court are presumed correct unless the applicant rebuts that presumption by 'clear and convincing evidence'" (quoting 28 U.S.C. § 2254(e)(1))). The OCCA's decision is neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record. 28 U.S.C. § 2254(d). As a result, federal habeas corpus relief is not warranted.

The governing standard for evaluating sufficiency of the evidence claims was set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). In *Jackson*, the Supreme Court stated that a reviewing court's critical inquiry was to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 318. The reviewing court does not determine "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 319 (emphasis in original). Instead, the relevant question is "whether, after viewing the

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Id.*

In the context of habeas corpus review, the AEDPA adds a second layer of deference to the *Jackson* standard. In *Coleman v. Johnson*, 566 U.S. 650 (2012), the Supreme Court stated as follows:

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

*Johnson*, 566 U.S. at 651 (internal quotation marks and citations omitted).

In this case, the OCCA did not explicitly cite to the *Jackson* standard in finding the evidence sufficient to sustain Petitioner's conviction for Human Trafficking for Commercial Sex (Exhibit 3 at 3-4). However, "[a] state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite to [the Supreme Court's] opinions." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)). "[I]t is well settled that a state court need not cite to specific Supreme Court precedent[.]" *Parker v. Scott*, 394 F.3d 1302, 1318 (10th Cir. 2005). Indeed, the state court "need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Mitchell*, 540 U.S.

at 16 (quoting *Early*, 537 U.S. at 8). *See also Simpson v. Carpenter*, 912 F.3d 542, 563 (10th Cir. 2018) (same). The evidence presented at trial clearly demonstrates the OCCA did not make an unreasonable determination of the facts in light of the evidence presented at trial and its decision affirming the verdict was not contrary to, or an unreasonable application of, *Jackson*.

This Court looks to Oklahoma law for the elements of Human Trafficking for Commercial Sex. *Jackson*, 443 U.S. at 324 n.16. *See also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir. 2003) ("In considering the OCCA's application of the *Jackson* sufficiency of the evidence standard, we apply Oklahoma law regarding the substantive elements of the offense."); *Wingfield v. Massie*, 122 F.3d 1329, 1332 (10th Cir. 1997) ("In applying the *Jackson* standard, we look to Oklahoma law to determine the 'substantive elements' of the relevant criminal offense."). In order to convict Petitioner of Human Trafficking for Commercial Sex, the State had to prove the following elements beyond a reasonable doubt:

> First, knowingly;
> Second, recruiting, enticing, maintaining, transporting or providing another person;
> Third, through coercion;
> Fourth, for the purpose of engaging that person in an act of commercial sex.

(O.R. 131). *See also* Okla. Stat. tit. 21, § 748(A)(6)(a). Coercion was defined for the jury as:

> Compelling or forcing or intimidating a person to act by:
>
> Threats of harm or physical restraint against any person.
> OR
> Facilitating or controlling a person's access to any addictive or controlled substance other than for legal medical purposes.

OR

Demanding or claiming money from a prostituted person where such demand or claim is directly related to the act of prostitution.

OR

Determining or dictating or setting the times at which another person will be available to engage in an act of prostitution with a third party.

OR

Determining or dictating or setting the places at which another person will reside for purposes of making such person available to engage in an act of prostitution with a third party.

(O.R. 132).  *See also* Okla. Stat. tit. 21, § 748(A)(1).  On direct appeal, Petitioner claimed the State failed to prove the element of coercion (Exhibit 1 at 15).  In his habeas petition, he claims the State failed to prove "that he trafficked anyone, except the word of someone who was regarding [A.H.'s] acts before she was allegedly a victim of human trafficking." Doc. 5 at 5-6.[8]  The evidence presented at trial supports the OCCA's decision to deny Petitioner's claim of insufficient evidence.

With the use of the word "or" in listing the ways coercion can be proven, Okla. Stat. tit. 21, § 748(A)(1)(a-j), the element would have been satisfied with proof that Petitioner compelled A.H. to act by doing any one of the acts listed.  *See Penny v. State*, 765 P.2d 797, 799 (Okla. Crim. App. 1988) (finding the Legislature's use of the disjunctive "or"

---

[8] As noted above, Petitioner's claim on direct appeal was that the State failed to prove the coercion element of Human Trafficking for Commercial Sex (Exhibit 1 at 15-21).  In his habeas petition, Petitioner claims that "the trial court erred in excluding the evidence," and that "[t]he jury was barred from considering compelling exculpatory evidence that supported Mr. Shelton's defense," without stating what evidence was allegedly improperly excluded.  Doc. 5 at 6.  Petitioner has not raised this claim to the OCCA, and has only raised it for the first time in this Court.  This particular aspect of Petitioner's Proposition IX is therefore unexhausted, and Respondent shows in its Proposition IV that it is subject to an anticipatory procedural bar.

provides "alternative ways of committing, and proving, this same essential element"). Instead, the State proved coercion by presenting proof of each alternative listed.

Petitioner compelled, forced, or intimidated A.H. to act by determining the place at which A.H. would stay for purposes of engaging in prostitution.  Okla. Stat. tit. 21, § 748(A)(1)(i).  After they arrived in Oklahoma City and made a trip to Ross, Petitioner took A.H. to an Americas Best Value Inn ("ABVI") at I-40 and Meridian (Tr. II 106-07). Though A.H. testified Petitioner rented the room because she did not have identification, he rented the room for the purpose of providing a place for A.H. "to make and service dates." (Tr. II 107).  Petitioner did not rent the room for A.H. to do as she pleased; rather, he rented it for her to perform "sexual acts in exchange for money."  (Tr. II 107-08).  A.H. did not ask Petitioner to rent the room for her (Tr. II 108).  After approximately a day and a half at the ABVI, Petitioner moved A.H. to the nearby Biltmore Hotel when she became worried that one of her potential clients was a police officer (Tr. II 124-25).  There, he put A.H. in the same room in which he and Michelle, his "top girl," or "top bitch," were staying (Tr. II 122, 125-26).  Though she did not have any dates at the Biltmore while working for Petitioner, that was Petitioner's purpose in taking her there as he repeatedly asked her if she had re-posted her ads seeking dates (Tr. II 126-27).  Petitioner grew agitated and upset when A.H.'s ads were not generating any dates while she was at the Biltmore (Tr. II 127).

Petitioner also compelled, forced, or intimidated A.H. to act by determining the times A.H. would be available to engage in prostitution.  Okla. Stat. tit. 21, § 748(A)(1)(h). Once at the ABVI, Petitioner told A.H. that another woman would be in touch with her to help her write an ad which would draw attention and generate dates (Tr. II 109).  This

woman helped A.H. choose which words to use, and Petitioner helped her choose which photographs to use (Tr. II 109-12).  Petitioner gave A.H. one of his phones to use to post her ad (Tr. II 112-13).  In a little more than twenty-four hours while at the ABVI, A.H. had more than ten dates in which she performed sexual acts in exchange for money (Tr. II 117).  During that time, A.H. left the motel only one time, when Petitioner took her to Taco Bell because she was hungry (Tr. II 124).  "All the other times [she] was either making dates or waiting for dates to call."  (Tr. II 124).  After he moved A.H. to the Biltmore, Petitioner repeatedly asked her if she had re-posted her ad, and her answer was always yes (Tr. II 126-27).  Petitioner was agitated and upset when the ad did not result in any dates (Tr. II 127).  When she spent the night in Ms. Hudson's room at the Biltmore, A.H. rejected Petitioner's phone calls which prompted him to call her phone "frantically." (Tr. II 131).

Petitioner also compelled, forced, or intimidated A.H. to act by claiming money from A.H., and such claim was directly related to her acts of prostitution.  Okla. Stat. 21, § 748(A)(1)(g).  At Petitioner's direction, A.H. would put the money her clients paid her in exchange for sexual acts in a drawer next to the bed (Tr. II 118-19).  Once she made $200 to $300, she would let Petitioner know and he would come pick the money up (Tr. II 118-19).  A.H.'s understanding of the working agreement between her and Petitioner was that she would keep some of the money she made, but Petitioner took every dollar that was paid to her and did not give her any of it (Tr. II 98-99, 119-20).  That Petitioner told A.H. that he was taking the money so that if she was robbed, she would not be robbed of a large amount of money (Tr. II 119), or that he bought her certain things to get her started in prostitution (Tr. II 97-98, 104), or that he paid for the motel rooms for her to engage in

prostitution (Tr. II 107, 125),[9] does not change the fact that he claimed the money from A.H., and his claim for the money was directly related to her acts of prostitution.  Okla. Stat. tit. 21, § 748(A)(1)(g).

The evidence also established that Petitioner compelled, forced, or intimidated A.H. to act by facilitating and controlling A.H.'s access to a controlled substance.  Okla. Stat. tit. 21, § 748(A)(1)(e).  Knowing her drug of choice from their first meeting, Petitioner supplied A.H. with methamphetamine while she worked for him, though she never asked him to get it for her (Tr. II 95-96, 123).  When Petitioner would come to the ABVI to pick up the money A.H. had made, or to bring her food, he would ask her, "Are you good, do you need anything else?" (Tr. II 123-24).  As he had already brought her food and asked her if she needed any more condoms, A.H. knew that with that question, Petitioner was asking her if she "need[ed] anything else to keep [her] up to continue making [her] dates" (Tr. II 124).  While at the ABVI and the Biltmore in July 2016, Petitioner was always the one to get her drugs, though she never asked for them (Tr. II 181-82).

Finally, Petitioner tried to compel, force, or intimidate A.H. to act by threatening her with harm when she decided to quit working for him.  Okla. Stat. tit. 21, § 748(A)(1)(a). When it became clear to A.H. that she would not be keeping any of the money she was being paid in exchange for sex acts, she wanted to leave the motel, but she felt there would be repercussions if she did so, even if Petitioner had not said anything outright (Tr. II 182).

---

[9] A.H. never asked Petitioner for any of the things he bought for her and never asked him to rent a motel room for her, and he never told A.H. that she owed him any money for anything he paid on her behalf (Tr. II 105-06, 108).

When A.H. spent the night in Ms. Hudson's room at the Biltmore, Petitioner began "frantically" calling A.H. when she rejected his initial calls (Tr. II 131-32).  Petitioner and Michelle then came to the room where A.H. was staying with Ms. Hudson and began banging and kicking on the front and back doors of the room (Tr. II 132).  Petitioner left when hotel security came to the room but later returned, prompting Ms. Hudson to call someone she knew as V.P. (Tr. II 135).  V.P. arrived with a gun and spoke to Petitioner, after which Petitioner left again (Tr. II 135-36).  After V.P. spoke to him, Petitioner yelled to A.H., "You're gonna get yours." (Tr. II 139).  She did not need Petitioner to "spell it out" for her – she knew Petitioner meant something was going to happen to her for her choice, and she "didn't want to stick around to find out what it was."  (Tr. II 139).  A.H. understood Petitioner's words as a threat that he would beat her if she stopped making money for him (Tr. II 158-60).

The above evidence is more than sufficient to prove Petitioner coerced A.H. into engaging in prostitution.  Despite Petitioner's attempt on direct appeal to spin the evidence to show otherwise, the evidence showed he compelled, forced, or intimidated A.H. into engaging in acts of prostitution by threatening her with harm, facilitating and controlling her access to methamphetamine, claiming money she was paid in exchange for her performance of sexual acts, determining the times at which she would be available for prostitution, and determining the places at which she would be available for prostitution. The jury's determination that Petitioner was guilty of Human Trafficking for Commercial Sex cannot be viewed as irrational and the OCCA's decision upholding the verdict cannot be considered "objectively unreasonable."  *Johnson*, 566 U.S. at 651.

On direct appeal, Petitioner pointed to A.H.'s testimony that he did not force her to come to Oklahoma City, and nobody made her perform sex acts in exchange for money (Tr. II 100-01, 153-54, 179, 182-83).  However, Section 748(E) specifically states that "[t]he consent of a victim to the activity prohibited by this section shall not constitute a defense."  Okla. Stat. tit. 21, § 748(E).  That A.H. took the drugs Petitioner provided her, let him know when it was time to pick up the money from the bedside drawer, placed her ads online and made dates, and did not try to leave the ABVI when she worked for Petitioner there as a prostitute in no way diminishes the evidence that his acts constituted coercion under Section 748(A)(1).

This Court does not re-weigh or reconsider evidence on habeas review.  *See Jackson*, 443 U.S. at 319 (emphasizing the deference owed to the trier of fact).  Rather, this Court accepts the jury's resolution of the evidence "as long as it is within the bounds of reason."  *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993).  Based on the evidence reflected in the record, there is no question that a rational trier of fact could have found beyond a reasonable doubt that Petitioner was guilty of Human Trafficking for Commercial Sex.  *Jackson*, 443 U.S. at 319.  As a result, this Court cannot conclude that the OCCA's decision upholding the jury's guilty verdict was based on an unreasonable determination of the facts, or was contrary to, or an unreasonable application of, *Jackson*.  *Johnson*, 566 U.S. at 651.  This Court should deny habeas relief to Petitioner on his Proposition IX.

## PROPOSITION IV

**PETITIONER'S PROPOSITIONS I, II, IV, AND A PORTION OF PROPOSITION IX ARE UNEXHAUSTED AND SUBJECT TO AN ANTICIPATORY PROCEDURAL BAR.**

**(In response to Petitioner's Propositions I, II, and IV, and in partial response to Petitioner's Proposition IX.)**

In his Proposition I, Petitioner claims appellate counsel was ineffective for failing to show he "was factually innocent of the accused crime." Doc. 1 at 5 (capitalization omitted). In his Proposition II, Petitioner claims appellate counsel was ineffective for failing to raise a claim that Petitioner's warrantless arrest lacked probable cause. Doc. 1 at 18. In his Proposition IV, Petitioner claims appellate counsel was ineffective for failing to raise a claim "when the State failed to file a brief in opposition or list of authorities opposing Mr. Shelton's motions and letters," resulting in the loss of jurisdiction by the Oklahoma County District Court to "impose a valid judgment." Doc. 5 at 2. Finally, within the sufficiency of the evidence claim in Petitioner's Proposition IX, he also claims that "the trial court erred in excluding the evidence," and that "[t]he jury was barred from considering compelling exculpatory evidence that supported Mr. Shelton's defense." Doc. 5 at 6. These claims have never been presented to the OCCA, and they are therefore unexhausted. If Petitioner were to return to state court in an attempt to exhaust these claims, the OCCA would find them procedurally barred in a second post-conviction proceeding. Accordingly, this Court should enforce the OCCA's procedural bar to these claims in an anticipatory manner.

"[E]xhaustion in the state courts is a prerequisite for habeas review in federal court." *Grant*, 886 F.3d at 927 (citing *Davila v. Davis*, __ U.S. __, 137 S. Ct. 2058, 2064 (2017); *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  *See also Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (state prisoners may not present claims for federal habeas relief unless they have exhausted their state court remedies (citing 28 U.S.C. § 2254(b)(1)(A))).  The AEDPA requires that a federal habeas petitioner "provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (quoting *Picard*, 404 U.S. at 276-77).  The Tenth Circuit has explained:

> "[T]he crucial inquiry is whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (citing *Picard*, 404 U.S. at 278, 92 S. Ct. 509).  "A petitioner need not invoke 'talismanic language' or cite 'book and verse on the federal constitution.'" *Id.* (quoting *Nichols v. Sullivan*, 867 F.2d 1250, 1252 (10th Cir. 1989)); accord *Picard*, 404 U.S. at 278, 92 S. Ct. 509.  But, a "'[f]air presentation' requires more than presenting 'all the facts necessary to support the federal claim' to the state court." *Bland* [*v. Sirmons*], 459 F.3d [999,] 1011 [10th Cir. 2006]) (emphasis added) (quoting *Anderson*, 459 U.S. at 6, 103 S. Ct. 276). . . .
>
> [I]n order to be fairly presented, the state-court claim must be the "substantial equivalent" of its federal habeas counterpart. *Picard*, 404 U.S. at 278, 92 S. Ct. 509.  There is no such substantial equivalency where the claim raised in habeas proceedings is "in a significantly different and stronger posture than it was when the state courts considered it." *Jones v. Hess*, 681 F.2d 688, 694 (10th Cir. 1982).  To satisfy exhaustion, then, the habeas petition's focus—as well as the alleged error that it identifies—cannot depart significantly from what the petitioner had presented to the state court.

*Grant*, 886 F.3d at 890-91.

As it pertains to his Proposition IX, the only sufficiency of the evidence claim Petitioner has presented to the OCCA is his claim that the State failed to prove the coercion element (Exhibit 1 at 12-21; Exhibit 3 at 3-4). Petitioner has never presented an argument to the OCCA that the evidence was somehow insufficient because the trial court erred in excluding some unspecified evidence.[10]

As it pertains to his Propositions I, II, and IV, in Petitioner's post-conviction proceedings in state district court, Petitioner claimed appellate counsel was ineffective for failing to make arguments on the substantive issues raised therein (Exhibit 5 at 4, 9-12, 15-17). However, in his appeal of the state district court's denial of post-conviction relief to the OCCA, Petitioner claimed only that the trial court erred in its rulings on the substantive issues, and no longer claimed appellate counsel was ineffective for failing to raise the substantive issues (Exhibit 14 at 3, 5, 7-8). Petitioner has never presented an argument to the OCCA that appellate counsel was ineffective for the reasons stated in his Propositions I, II, and IV.

"[A] 'petitioner cannot assert entirely different arguments [in his or her request for habeas relief] from those raised in the state court.'" *Grant*, 886 F.3d at 891 (quoting *Bland*,

---

[10] Indeed, such a claim would be distinct from a sufficiency of the evidence claim, as a sufficiency review focuses only on the evidence before the jury, irrespective of whether evidence may have been improperly admitted or excluded. *See McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (a court reviewing for sufficiency of the evidence "'must consider all of the evidence admitted by the trial court,' regardless of whether that evidence was admitted erroneously" (quoting *Lockhart v. Nelson*, 488 U.S. 33, 41 (1988))).

459 F.3d at 1011). "That is, there is no fair presentation if the claim before the state court was only 'somewhat similar' to the claim pressed in the habeas petition." *Id.* (quoting *Duncan v. Henry*, 513 U.S. 364 (1995)). *See also Dever*, 36 F.3d at 1534 ("The exhaustion requirement is satisfied if the federal issue has been properly presented to the highest state court, either by direct review of the conviction or in a post-conviction attack.").

If Petitioner were to return to state court in an attempt to exhaust the claims at issue in this proposition, the OCCA would undoubtedly find them procedurally barred because they could have been raised on direct appeal. *Grant*, 886 F.3d at 901 (recognizing that under Oklahoma's Uniform Post-Conviction Procedure Act, Okla. Stat. tit. 22, § 1089(C)(1) (2011), "'only claims which [w]ere not and could not have been raised on direct appeal will be considered [in post-conviction proceedings]'" (internal quote omitted) (alteration in original)). Petitioner's claims are procedurally defaulted:

> Where the relevant state courts "would now find those claims procedurally barred, there is a procedural default for the purposes of federal habeas review." *Bland*, 459 F.3d at 1012 (quoting *Dulin v. Cook*, 957 F.2d 758, 759 (10th Cir. 1992)); *see also Moore v. Schoeman*, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it.") (citing *Hain v. Gibson*, 287 F.3d 1224, 1240 (10th Cir. 2002)).

*Grant*, 886 F.3d at 892. Like the unexhausted claim in *Grant*, Petitioner's claims are "doubly subject to the anticipatory procedural bar" because they would be raised "for the first time in a *successive* petition for post-conviction relief." *Grant*, 886 F.3d at 901 n.8 (emphasis in original). *See Smith v. State*, 878 P.2d 375, 377 (Okla. Crim. App. 1994)

("issues which could have been raised on direct appeal or in the first post-conviction application, but were not, are waived" (citing Okla. Stat. tit. 22, § 1086)). *See also Medlock v. Ward*, 200 F.3d 1314, 1323 (10th Cir. 2000) ("Despite the especially vigilant scrutiny we apply in examining procedural bars to ineffective assistance claims, we have held that Oklahoma's procedural bar to claims not raised on initial post-conviction review is independent and adequate.").

Dismissal without prejudice is not appropriate in this case because the OCCA would find Petitioner's claims "procedurally barred on independent and adequate state procedural grounds," namely Oklahoma's Post-Conviction Relief Act. *Grant*, 886 F.3d at 892. It is well established that Section 1086 of Oklahoma's Post-Conviction Relief Act provides an independent and adequate state procedural bar. *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008); *Sherrill v. Hargett*, 184 F.3d 1172, 1175 (10th Cir. 1999); *Odum v. Boone*, 62 F.3d 327, 331 (10th Cir. 1995). This Court should find that the claims at issue here are subject to an anticipatory procedural bar.

This Court should further decline to review Petitioner's claims because he cannot overcome the procedural bar.

> A petitioner may overcome the procedural bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman* [*v. Thompson*], 501 U.S. [722,] 750, 111 S. Ct. 2546 [(1991)].

*Grant*, 886 F.3d at 892.

Petitioner cannot satisfy the cause and prejudice exception to the procedural bar. The Supreme Court has explained that "'cause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753 (emphasis in original). Petitioner does not acknowledge he has never presented the claims at issue in this proposition to the OCCA, and therefore makes no effort to overcome the procedural bar. Doc. 1 at 5, 18, 21; Doc. 5 at 2, 5-6. As Petitioner cannot demonstrate cause for his default, Respondent need not address the issue of prejudice. *See Steele v. Young*, 11 F.3d 1518, 1522 n.7 (10th Cir. 1993).

Petitioner also makes no effort to overcome the anticipatory bar by demonstrating that this Court's refusal to review these claims will result in a fundamental miscarriage of justice. As a result, this Court should refuse to review the same. *See Grant*, 886 F.3d at 902 (where the petitioner made "no effort to overcome [the anticipatory] bar by arguing cause and prejudice, or a fundamental miscarriage of justice," the Court was "precluded from considering [the petitioner's] procedural due process competency claim"). Nevertheless, in his Proposition IX, Petitioner claims the evidence was insufficient to sustain his conviction, and in his Proposition I, he presents a lengthy argument that appellate counsel was ineffective for failing to show he was "factually innocent" of the crime. Doc. 1 at 5-17; Doc. 5 at 5-6. However, Petitioner's Proposition I is nothing more than another sufficiency of the evidence claim, as it is supported only by evidence presented at trial. Doc. 1 at 5-17. It is therefore at most a claim of legal innocence, not factual innocence, and is insufficient to establish a fundamental miscarriage of justice. *See Lowery v. Bryant*, No. 18-6158, 760 Fed. Appx. 617, 619 (10th Cir. Jan. 15, 2019)

(unpublished) (stating that an "actual innocence claim based on insufficiency of the evidence . . . would show only legal innocence," and not factual innocence). *See also Thacker v. Workman*, 678 F.3d 820, 842 (10th Cir. 2012) (the miscarriage of justice exception "hinges on a persuasive showing that [Petitioner] is actually innocent"); *Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000) (holding that the miscarriage of justice exception applies only to claims of factual innocence, not legal innocence).

Petitioner's Propositions I, II, IV, and a portion of his Proposition IX are unexhausted and would be procedurally barred by the OCCA if he were to present them in a second post-conviction application.  Because Petitioner cannot overcome the procedural bar to the same, he is not entitled to relief.  This Court should apply an anticipatory procedural bar and decline to entertain these unexhausted claims of error.

## CONCLUSION

Respondent concedes Petitioner is entitled to federal habeas relief in the form of a new trial based on his Proposition VII.  This concession renders Petitioner's claims in his Propositions III, V, VI, VIII, XI, XII, and XIII moot.  As it pertains to Petitioner's Proposition IX, Respondent has further shown that the OCCA's decision that Petitioner's conviction was supported by sufficient evidence was neither contrary to, nor an unreasonable application of, federal law, nor an unreasonable determination of the facts in light of the state court record.  Finally, Respondent has shown that Petitioner's Propositions I, II, IV, and a portion of his Proposition IX, are unexhausted, and should not be entertained due to the procedural bar which the OCCA would apply if Petitioner returned to state court to exhaust them.

Respectfully submitted,

**JOHN M. O'CONNOR**
**ATTORNEY GENERAL OF OKLAHOMA**

s/ **KEELEY L. MILLER**
**KEELEY L. MILLER, OBA # 18389**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21ˢᵗ Street
Oklahoma City, Oklahoma 73105
(405) 521-3921       FAX (405) 522-4534
Service email: fhc.docket@oag.ok.gov

**ATTORNEYS FOR RESPONDENT**

**CERTIFICATE OF SERVICE**

**X**      I hereby certify that on May 3, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.

**X**      I hereby certify that on May 3, 2022, I served the attached document by mail on the following, who is not a registered participant of the ECF System:

Milton Shelton, # 246506
Helena-JCCC
Unit 6
216 N. Murray St.
Helena, OK  73741-9606

s/ Keeley L. Miller